## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRADLEY J. MCLACHLAN and ALEX D. GRAHAM, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>THE BOARD OF TRUSTEES OF THE ELEVATOR CONSTRUCTORS ANNUITY AND 401(K) RETIREMENT PLAN and JOHN DOES 1-20.<br><br>     Defendants. | CIVIL ACTION NO.: 2:22-cv-04115 |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Bradley J. McLachlan and Alex D. Graham, ("Plaintiffs"), by and through their attorneys, on behalf of the Elevator Constructors Annuity and 401(k) Retirement Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.  INTRODUCTION

1. This is a proposed class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include the Board of Trustees of the Elevator Constructors Annuity and 401(k) Retirement Plan and its members during the Class Period ("Trustees").[2]

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] As will be discussed in more detail below, the Class Period is defined as October 13, 2016 through the date of judgment ("Class Period"). In addition, although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *infra,* at n.3; *see also Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

(D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98

(9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's

investment results over time because "[b]eneficiaries subject to higher fees … lose not only money

spent on higher fees, but also lost investment opportunity; that is, the money that the portion of

their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at

1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the

beneficiary's investment shrinks.").

7.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence

in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor

investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the

duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes

v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.     Because cost-conscious management is fundamental to prudence in the investment

function the concept applies to a fiduciary's obligation to continuously monitor all fees incurred

by plan participants, including a plan's RKA fees.

9.     At all times during the Class Period, the Plan had at least $2.6 billion dollars in

assets under management.  At the Plan's fiscal year end in 2020 and 2019, the Plan had over $4.9

billion dollars and $4.4 billion dollars, respectively, in assets under management that were/are

entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be
aware that your employer also has a specific obligation to consider the fees and expenses paid by
your plan.").

Auditor of the Elevator Constructors Annuity and 401(k) Retirement Plan ("2020 Auditor Report") at 3.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     The Plan is also large in terms of the number of its participants.  From 2016 to 2020, the Plan had between 25,646 and 29,976 participants with account balances. For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with 20,000 to 29,999 participants with account balances.  Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (2) failing to control the Plan's recordkeeping and administration ("RKA") costs.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. §

1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### Plaintiffs

18.      Plaintiff, Bradley J. McLachlan ("McLachlan"), resides in Spokane, Washington. During his employment, Plaintiff McLachlan participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff McLachlan suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff McLachlan specifically invested in the T. Rowe Price Retirement 2030 Fund complained of, below. He

suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff McLachlan suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the assistance of Segal Advisors who received at least $183,100 during 2020, the cost of which was borne by each participant in the Plan. Further, Plaintiff McLachlan suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high RKA costs and underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.     Plaintiff, Alex D. Graham ("Graham"), resides in Douglasville, Georgia. During his employment, Plaintiff Graham participated in the Plan investing in the options offered by the Plan and was subject to the excessive RKA costs alleged below. Plaintiff Graham suffered injury to his Plan account by overpaying for his share of RKA costs. Plaintiff Graham specifically invested in the Janus Henderson Venture Fund complained of, below. He suffered further injury to his Plan account from the underperformance and excessive expense of this fund. In addition, Plaintiff Graham suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. These funds were maintained and monitored with the

assistance of Segal Advisors who received at least $183,100 during 2020, the cost of which was borne by each participant in the Plan.  Further, Plaintiff Graham suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the high RKA costs and underperforming funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

20.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  In addition, Plaintiffs have standing because they suffered damage to their plan accounts by having to pay their share of the consulting fee charged by Segal Advisors to maintain and manage the funds specifically identified below which have excessive expense ratios and which include, but are not limited to, those funds not specifically identified but which are used to pay for the excessive total plan costs. Further, Plaintiffs have standing because their claims against their share of investments in the Plan is diminished by the high RKA costs and underperforming funds suffered by the Plan whether they are specifically identified herein or not, as discussed above.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.    Plaintiffs did not have knowledge of all material facts (including, among other things, total plan RKA cost comparisons to similarly-sized plans or information regarding other

available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Trustee Defendants**

22.     The Elevator Constructors Annuity and 401(k) Retirement Plan ("Plan") is a multiemployer plan also often referred to as a "Taft-Hartley" plan[4]. A multiemployer plan is collectively bargained for by a labor union and more than one contributing employer, typically of related or similar industries ("Participating Employer"). *Id.* Here, the sponsor of the Plan is the Board of Trustees of the Elevator Constructors Annuity and 401(k) Retirement Plan ("Trustees"). The Trustees are responsible for, among other things, ensuring that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for RKA services. 2020 Auditor Report at 4.

23.     As stated in the Plan's Investment Policy Statement, the Trustees must evaluate "the performance of each investment option the 401(k) Plan offers on a quarterly basis, including the risk and return of each such option in absolute terms and compared to relevant benchmark and peers." The Investment Policy Statement of the Elevator Constructors Annuity and 401(k) Retirement Plan ("IPS") at 9. In addition, the Trustees are ultimately responsible for evaluating the "the reasonableness of investment management, recordkeeping and investment consulting costs and fees." IPS at 3.

---

[4] Multiemployer v. Multiple Employer at 1, published by Ekon Benefits and available at https://www.ekonbenefits.com/publish/pdf/251/spotlight_201506.pdf

24.     The Trustees and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

25.     The Trustees and unnamed members of the Trustees during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Trustee Defendants."

**Additional John Doe Defendants**

26.     To the extent that there are additional officers, employees and/or contractors of related to the Plan who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 11-20 include, but are not limited to, any officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between October 13, 2016 through the date of judgment (the "Class Period").

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

28.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 29,976 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

29.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

30.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Trustee Defendants failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

31.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no

interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

32.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

33.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLAN

34.     The Plan is a defined contribution plan covering substantially all eligible employees of the members of the Elevator Constructors Annuity and 401(k) Retirement Plan. 2020 Auditor Report at 4. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id.*  Consequently, retirement

benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

35.     In general, the Plan covers all employees of the members of the Elevator Constructors Annuity and 401(k) Retirement Plan who are age 18 or older. *Id.*

### *Contributions*

36.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2020 Auditor Report at 12.

37.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to contributions made by the employer, those amounts are determined by each Participating Employer. *Id.*

38.     Like other companies that sponsor 401(k) plans for their employees, the Participating Employers of the Plan enjoy both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

39.     The Participating Employers of the Plan also benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers'

efforts      to      attract      new      employees      and      reduce      turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

40.     Given the size of the Plan, the Plan's Participating Employers likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

41.     Vesting is determined by each Participating Employer. *Id.*

***The Plan's Investments***

42.     In theory, the Trustees determine the appropriateness of the Plan's investment offerings, monitors investment performance and reviews total plan and fund costs each year. 2020 Auditor Report at 3. As will be discussed in more detail below, the Trustees fell well short of these fiduciary goals.

43.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Trustees.

44.     The Plan's assets under management for all funds as of December 31, 2020 was $1,585,494,544.  2020 Auditor Report at 3.

***Payment of Plan Expenses***

45.     During the Class Period, administrative and RKA expenses were generally paid using a combination of charges to the participants and Plan assets. 2020 Auditor Report at 5.

**VIII.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

      A.  **The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

46.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

47.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

48.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring RKA costs, because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

49.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Trustees' meeting minutes.  This request was made on April 7, 2022. By letter dated April 27, 2022, the Trustees denied the Plaintiffs' request for meeting minutes.

50.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary

fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

51.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

52.     For example, Defendants did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than comparable funds found in similarly sized plans (conservatively, plans having over 1 billion dollars in assets).

53.     With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

54.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

55.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

56.    Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

57.    Had a prudent process been used, the Plan would not have been saddled with a total plan cost that was more than 160% **higher** than the median for similar plans.

58.    "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst working through its related analytical arm the Investment Company Institute ("ICI") "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."[7]

59.    Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[8]

60.    The ICI conducted a study in 2018 (*see* fn. 6) which calculated the average total plan costs from hundreds of 401(k) plans ranging in size from the smallest plans having less than 1 million dollars in assets all the way up the nation's largest plans with assets under management of more than 1 billion dollars.  Looking at plans that have over 1 billion dollars, the ICI determined that the average asset weighted total plan cost or TPC for 401(k) Plans with over 1 billion dollars in assets under management is .22% of total plan assets.

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

[7] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2018* at 55 (July 2021) (hereafter, "ICI Study") available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

61.     Here, the Plan's total costs ranged from a high of .62% in 2018, or more than 180% above the median, to a low of .59 in 2020, or more than 160% above the median of .22%. Again, the median here is only a rough guide and indeed a well-run plan should have costs less than the median. But clearly, the Plan's fiduciaries fell well short of the goal to have the Plan and participants pay only reasonable fees.

62.     One explanation for this excessive total plan cost, is that the many of the funds in the Plan were much more expensive to maintain than funds found in similar plans. Similar to the total plan cost analysis above, the ICI Study also evaluates the overall expense of particular funds that might be found in a particular plan. Here, the expenses for several of the funds in the Plan were well above ICI medians as illustrated by the chart below:

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| Invesco Oppenheimer Global Allocation Fund | 0.86 % | International Equity | 0.49% |
| Invesco Oppenheimer Global Opportunities Fund | 0.69 % | International Equity | 0.49% |
| Janus Venture Fund | 0.67 % | Domestic Equity | 0.31% |
| MassMutual Premier Core Bond Fund | 0.43 % | Domestic Bonds | 0.37% |
| MassMutual Select Diversified Value Fund | 0.58 % | Domestic Equity | 0.31% |
| MassMutual Select Growth Opportunities Fund | 0.76 % | Domestic Equity | 0.31% |
| MassMutual Select Mid Cap Growth Equity II Fund | 0.71 % | Domestic Equity | 0.31% |
| MassMutual Select Mid Cap Value Fund | 0.81 % | Domestic Equity | 0.31% |
| MassMutual Select Small Company Value Fund | 0.98 % | Domestic Equity | 0.31% |
| T.Rowe Price Retirement 2020 Fund | 0.42 % | Target-date | 0.40% |
| T.Rowe Price Retirement 2030 Fund | 0.49% | Target-date | 0.40% |

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| T.Rowe Price Retirement 2040 Fund | 0.51% | Target-date | 0.40% |
| T.Rowe Price Retirement 2050 Fund | 0.52 % | Target-date | 0.40% |
| T.Rowe Price Retirement 2060 Fund | 0.52 % | Target-date | 0.40% |

63.      It's no excuse that the Plan may have utilized the higher fees to pay its RKA costs. The better practice is to negotiate the lowest possible RKA fees and to negotiate the lowest possible fund expense for the Plan independently of each other.  Here, as will be discussed below, the Plan's RKA fees were exorbitant when compared to plans of similar size which is the crux of this lawsuit.

**(B)      The Plan's Recordkeeping and Administrative Costs Were Excessive During The Class Period**

64.      Another clear indication of Defendants' imprudent fee monitoring process was the excessive RKA fees Plan participants were required to pay during the Class Period.

65.      The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  RKA services fees are one and the same and the terms are used synonymously herein.

66.      There are two types of essential RKA services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of RKA services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

  A.  Recordkeeping;

B.   Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.   Administrative services related to converting a plan from one recordkeeper to another;

D.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.   Maintenance of an employer stock fund (if needed);

F.   Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.   Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.   Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

I.   Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

---

[9]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

J.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

67.    This suite of essential RKA services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

68.    The second type of essential RKA services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

A.  Loan processing;

B.  Brokerage services/account maintenance (if offered by the plan);

C.  Distribution services; and

D.  Processing of qualified domestic relations orders.

69.    All national recordkeepers have the capability to provide all of the aforementioned RKA services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

70.    The Recordkeeper, Massachusetts Mutual Life Insurance Company ("Mass Mutual"), identified as the Recordkeeper on the Plan's 5500 filings, provided services in line with

20

the routine bundled and A La Carte service categories described above. The RKA services performed each year during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example.

71.     RKA services often depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant RKA fees. Because RKA expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

72.     RKA expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for RKA and trustee services that the mutual fund company otherwise would have to provide.

73.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

74.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being

paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

75.     In this matter, using a combination of RKA charges paid by participants with revenue sharing used to potentially cover additional fees resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market RKA fees.

76.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available by conducting a Request for Proposal ("RFP") in a prudent manner to determine if RKA expenses appear high in relation to the general marketplace, and specifically, of like-situated plans. More specifically, an RFP should happen frequently if fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

77.     Because the Plan paid yearly amounts in RKA fees that were well above industry standards each year over the Class Period, there is little to suggest that Defendants conducted an appropriate RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plan could obtain better RKA fee pricing from other service providers given that the market for RKA services is highly competitive, with many vendors equally capable of providing a high-level service.

78.     Instead, the Plan was saddled by outrageous per participant fees as high as $125 per participant in 2020 with the lowest yearly per participant fee being $95 in 2016. The chart below illustrates these excessive costs:

| Year | Particip- ants | Direct Cost | Massachusetts Mutual Life Ins Co | Indirect[10] | Total | Compensa- tion per Participant |
|------|------|------|------|------|------|------|
| 2016 | 25646 | $1,512,223 | $243,017 | $700,509 | $2,455,749 | $95.76 |
| 2017 | 27902 | $1,596,916 | $825,975 | $561,558 | $2,984,449 | $106.96 |
| 2018 | 28211 | $2,010,205 | $851,790 | $568,321 | $3,430,316 | $121.59 |
| 2019 | 29246 | $2,485,264 | $852,310 | -- | $3,337,574 | $114.12 |
| 2020 | 29976 | $2,923,353 | $850,000 | -- | $3,773,353 | $125.88 |

79.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

80.     The recordkeeper throughout the Class Period was Mass Mutual. At all times during the Class Period, the Plan had at least 25,000 participants and over $2.6 billion dollars in assets under management. As of 2020, the Plan had over 29,000 participants and over $4.9 billion dollars in assets under management making it eligible for some of the lowest fees on the market.

81.     Let's start with what another major recordkeeper in the marketplace, Fidelity, would pay if it were in Defendants' shoes. In a recent lawsuit where Fidelity's multi-billion dollar plan with tens of thousands of participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would

---

[10] Indirect compensation is calculated by using the percent of revenue sharing reported for each fund on Schedule C of the form 5500 for each year at issue relating to indirect revenue. The vast majority of funds for the Plan which pay revenue sharing are listed there. However, should there be a fund which is believed to pay additional revenue sharing not listed in Schedule "C," the information would have been obtained from the funds' prospectus where the amount of revenue sharing is disclosed for a particular share class. In addition, the data for indirect revenue is incomplete for 2019 and 2020 and it's expected that once complete data is reviewed there will be significant amounts of revenue sharing for these years.

range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

82.     Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that ***Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year***. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. ***The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).***

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

83.     The Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for recordkeeping and administration fees as low as $14 and up to $21 per participant in recordkeeping and administration fees.

84.     Further, looking at recordkeeping costs for plans of a similar size in 2018, as an exemplar year indicative of the other years of the Class Period, shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few plans having more than 17,000 participants and more than $300 million dollars in assets under management:

| Plan Name | Number of Participants | Assets Under Management | R&A Costs on Per-Participant Basis[11] | Record-keeper |
|---|---|---|---|---|
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | **$26** | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | **$23** | T.Rowe |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | **$28** | Fidelity |
| Deseret 401(k) Plan | 34,357 | $3,381,868,127 | **$25** | Great-West |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | **$28** | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |

85.     These figures remain consistent over the span of the Class Period.  From 2013 to 2019, there were plans ranging in size from 3,000 participants to over 18,000 participants that paid less than the Plan.  The below chart reflects fees paid by these plans for recordkeeping and administration costs.  As noted in footnote 10, the plans selected here used funds that included either little or no revenue sharing thus making any indirect compensation inconsequential. Because of economies of scale, the Plan's fiduciaries should have been able to negotiate per participant RKA costs less than the plans below paid:

---

[11] The per participant numbers are derived from the Plan's annual 5500 filings which are publicly available and on file with the United States Department of Labor. In addition, the comparator plans chosen are plans that have little to no revenue sharing and it's for this reason that revenue sharing from a plan's funds are not added to per participant amounts.

| Year | Plan Name | Assets | Prtcpnts | Part Fee[11] | Recordkeeper |
|------|-----------|--------|----------|---------|--------------|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare Retirement Plan | $107,652,510 | 9,750 | $28 | Great-West |
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |

86.     Thus, the Plan, with over 28,000 participants and over $3.4 billion dollars in assets in 2018, should have been able to negotiate recordkeeping costs ranging from $14 to the low $30 range from the beginning of the Class Period to the present. Anything above that would be an outlier especially later in the Class Period when RKA costs per participant should have been at the cheapest.[12]

87.     The 22ndEdition of the 401(k) Averages study, confirms these findings. Without factoring in amounts of revenue sharing, as is done here, the 401(k) Averages study found that the

---

[12] *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

average plan with over 2,000 participants and 200 million in assets, paid no more than $13 per participant. 401(k) Averages Book, 22ndEdition, Pension Data Source, Inc., ("401(k) Averages") at 108.

88.     One final piece of data that underscores the unreasonableness of the RKA costs in this case is data released by NEPC, a consulting group. Its 16th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report ("NEPC Report")[13] took a survey of various defined contribution plan fees.  The NEPC Report found that the average plan with over 15,000 participants paid around $45 per participant for trust and recordkeeping fees. The $45 number is slightly higher than the other studies found herein because it includes trustee fees whereas the other studies do not.  It's no excuse that a multiemployer plan, such as the Plan, may or may not be saddled with additional administrative work due to the number of participating employers participating in the Plan. A jumbo multiemployer plan, such as the Plan, should be able to obtain the same competitive rates as jumbo 401(k) or 403(b) plans that have over 1 billion dollars in assets and over 15,000 participants. It should cost no more simply because a plan is an multiemployer plan. At best, the additional cost, if any, would be minimal in the neighborhood of an additional $1 or $2 per participant.

89.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that

---

[13] Available at https://www.nepc.com/institutional/dc-plan-trends-fee-results-2021/?submissionGuid=9afc0c43-55b6-4f8f-aae0-8a9cedc91fba last accessed on September 8, 2022.

the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

90.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting an RFP process at reasonable intervals as discussed above.

91.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**(C) Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

92.     The Plan failed to replace several of the higher cost and underperforming funds which in 2020 housed over $280 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money."[14] Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

93.     Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or

---

[14] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

sooner. Failure to do so cost the Plan and its participants millions of dollars in lost opportunity and revenue.

94.     There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

95.     The chart below choses a few of these superior performing alternatives out of the hundreds available for each fund and compares them to the underperforming funds currently in the Plan:

| Current | ER | LFA | LFA ER |
|---|---|---|---|
| MassMutual Select Growth Opps I | 0.75 % | Bridge Builder Large Cap Growth | 0.19% |
| | | Vanguard U.S. Growth Fund Admiral Shares | 0.28% |
| MassMutual Select Diversified Value I | 0.58 % | Vanguard Equity-Income Adm | 0.19% |
| | | Vanguard Windsor Fund Admiral Shares | 0.19% |
| | | Bridge Builder Large Cap Value | 0.24% |
| | | Vanguard Windsor II Fund Admiral Shares | 0.26% |
| | | American Funds American Mutual R6 | 0.27% |
| MassMutual Select Small Company Val | 0.98 % | Bridgeway Omni Small-Cap Value N | 0.60% |
| | | Wells Fargo Small Company Value R6 | 0.75% |
| American Funds Europacific Growth R6 | 0.46 % | Vanguard International Growth ADM | 0.32% |
| MassMutual Select Mid-Cap Value | 0.81 % | DFA US Vector Equity I | 0.28% |
| | | Vanguard Selected Value Inv | 0.31% |

96.     Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but most of the suggested alternative funds outperformed the funds in the Plan significantly. The difference between the excessive fees paid for these underperforming funds and

the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years. The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below:

| Current | Benchmark[15] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| MassMutual Select Growth Opps I | Morningstar Large Growth | | -7.07% | -3.64% |
| | | Vanguard U.S. Growth Fund Admiral Shares | -1.04% | 0.27% |
| | | | | |
| MassMutual Select Diversified Value I | Morningstar Large Value | | 0.21% | 0.52% |
| | | Vanguard Windsor II Fund Admiral Shares | 3.58% | 2.36% |
| | | | | |
| MassMutual Select Small Company Val | Morningstar Small Value | | 0.03% | 0.38% |
| | | Bridgeway Omni Small-Cap Value N | 5.7% | 1.7% |
| | | | | |

[15] Benchmark funds are the categories assigned to each fund in the Plan by Morningstar, a well respected financial database. The benchmark's returns as of three and five years are from Morningstar at July 31, 22. The returns from the funds in the Plan and the comparator funds listed are similarly from July 31, 2022.

| Current | Benchmark[15] | Alternative Fund | Benchmark Relative | |
|---|---|---|---|---|
| | | | 3Y | 5Y |
| American Funds Europacific Growth R6 | Morningstar Foreign Large Growth | | -0.89% | -1.09% |
| | | Vanguard International Growth | 5.19% | 3.62% |
| | | | | |
| MassMutual Select Mid-Cap Value | Morningstar Mid-Cap Value | | 0.07% | 0.56% |
| | | DFA US Vector Equity I | 1.1% | 1% |

97.    One of these funds, Mass Mutual Select Growth Opps I, had one of the worst performance histories as compared to the more than a thousand of its peer funds. At the 3 Year mark, Mass Mutual Select Growth Opps I performed worse than 93% of its 1,186 peer funds and at the 5 year mark it performed worse than 91% of its 1,142 peer funds.

98.    Because a fiduciary must have the best interests of participants in mind, performance is defined, not just on an actual return basis, but quantified on an absolute and relative volatility basis which considers returns on a risk adjusted basis.  Fiduciaries utilize Modern Portfolio Theory or a nearly identical methodology (MPT) to make such assessments and the Trustees utterly failed to select prudent investments for the Plan based on several criteria under the MPT.

99.    Modern trust law and those who have a legal fiduciary duty to choose and review investments on behalf of others, apply the tools of Modern Portfolio Theory or a nearly identical methodology in evaluating a trustee's or fiduciary's investment choices and overall strategy. UPIA § 2(b) (Unif. Law Comm'n 1995); Restatement (Third) of Trusts § 90(a) (2007) ("This standard

requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."). *See Birse v. CenturyLink, Inc.*, 2019 WL 9467530, * 5 (D. Col. Oct. 23, 2019).

100.    Had MPT theory or a nearly identical methodology been properly utilized these funds would not have been selected. The goal of MPT theory is to select funds that are among the best in their class, and, accordingly, one would expect to see a fund with the lowest possible expense ratio available and which performed in the upper tier of its class. Even if the Defendants relied on the added excessive expensive ratios to pay for administrative and recordkeeping fees, a prudent fiduciary utilizing MPT appropriately would have to negotiate the lowest possible administrative and recordkeeping costs available and charged only those costs, and nothing more, directly to participants or the Plan.  But Defendants didn't even get close to that standard as the above allegations demonstrate that fees for the challenged funds were sometimes triple available alternative funds.

101.    What's worse, maintaining these funds in the Plan cost all participants lost savings opportunity not just those that had invested in these funds. Continuing to monitor and maintain these underperforming funds cost the Plan more in advisory services to purportedly assist the Defendants in monitoring the performance and expense of these funds. Instead, the better practice would have been to maintain funds in the Plan that paid no more expense than reasonable and simply performed better. Doing so, would have removed the need for much of the advisory fees paid during the Class Period and would have kept those expenses in participants savings accounts which would have compounded over time. In 2020, advisory fees totaled $183,100. 2020 Form 5500 at 3-1.

102.     A prudent fiduciary should have been aware of these better preforming lower cost alternatives and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

**(D)     The Plan's Target Date Funds were not in the Best Available Format**

103.     Many 401(k) plans offer a group of investments commonly known as a target date suite. Target date suites typically consist of several funds from the same family of funds focusing on an individual's anticipated date of retirement. Typically, a target date suite will consist of funds that consider an individual's anticipated retirement date at 5 year intervals, depending on the individual. For example, there may be six funds in the same target date suite but one of those funds may be focused on older investors with an anticipated retirement date of 2030, for example and another fund in the same suite may be focused on younger investors with an anticipated retirement date in 2055.

104.     The Financial Industry Regulatory Authority, commonly known as FINRA, which acts as the watchdog for the financial industry, describes target date funds as follows:

> Target-date funds are designed to help manage investment risk. You pick a fund with a target year that is closest to the year you anticipate retiring, say a "2050 Fund." The closer a fund gets to its target date, the more it focuses on assets that traditionally have a lower risk profile, such as fixed income, cash and cash equivalents. This shift across asset classes is called a "glide path." A fund's glide path is designed to reduce investment risk over time—but glide paths can vary considerably from fund to fund.

Save the Date: Target-Date Funds Explained published by FINRA dated April 21, 2022, available on its website at https://www.finra.org/investors/insights/save-date-target-date-funds-explained.

Last accessed on May 4, 2022.

105.     Here, the Plan offered the T.Rowe Price Retirement series of target date funds. The T.Rowe Price Target date funds are offered in several share classes as a mutual funds which include the Investor Class, the Advisor Class including a collective investment trust option ("CIT"). At the beginning of the Class Period the Plan offered the Advisor Class series of target date funds. The Advisor class had expense ratios ranging from 0.92% for the 2030 fund to 0.97% for the 2060 fund which is the second most expensive target date fund suite offered in this lineup. The Plan finally moved to the Investor Class in 2019 which was too little too late as to the damages to the Plan had already been baked in. The Investor class was a choice which was still not the best choice for the Plan.

106.     The Investor Class had expense ratios ranging from 0.53% for the 2030 fund to 0.59% for the 2060 fund. However, the Plan could certainly have qualified for the CIT version of this target date fund. The CIT version is nearly identical to its mutual fund version in all material respects having the same fund managers and same underlying investments. The Tr A version of this target date fund, which was available throughout the entire Class Period, had a set expense ratio of 0.46% for all target date years from 2020 to 2060. Had either the CIT version of this target date suite or the Investor class version been selected from the inception of the Class Period, the Plan would have realized greater savings which would have compounded over the years.

**(E )   The Plan had a Disproportionate Share of its Investments in Insurance Annuity Based Investments**

107.     A plan having at least $2.6 billion dollars at all time during the Class Period, such as the Plan, certainly should not be concentrating its assets in retail insurance based annuity products. In 2016, $1.8 billion out of the total $2.6 billion, or approximately 69% of the assets in the Plan were invested in insurance based annuity products. By 2020, this percentage remained constant even thought the total assets had nearly doubled. In 2020, $3.4 billion dollars out of a

total of $4.9 billion dollars, or approximately 69% of the assets in the Plan were invested in insurance based annuity products. Similar results are seen for each year of the Class Period. There's no plausible explanation that would allow for such a high percentage of assets to be placed in retail level annuity products of this type.

108.    Forbes Magazine, a well-respected publication of the financial industry, described insurance based group annuity products as follows:

> Among 401(k) plans designed for small companies, the total fees on some group annuities can top $1,000 per participant every year, or three times what low-cost 401(k) plans cost, according to data provider 401kSource. Have second thoughts after signing up and you'll discover that buying a group annuity is like joining the Sopranos. … Some insurers, including New York Life, refuse to offer group annuities. Deanna Garen, a managing director for the firm, points out that, in theory, retirement savings plans with annuitization features are a great idea. Unfortunately, says Garen, the ones on the market are too confusing and costly. "They just haven't evolved to the point where there are sensible fee structures," she says.

*See*, https://www.forbes.com/forbes/2009/0713/group-annuity-aig-retirement-plans-from-hell.html#77641d07219f last accessed on August 24, 2022.

109.    The annuity investments found in the Plan are no different. The Plan is burdened with investments lacking transparent pricing and returns just as described in the Forbes article cited above.

110.    The Plan would have been much better off without retail annuity investments. The more prudent choice would have been to use the Plan's economies of scale to put the money into institutional level investments with much lower costs and better returns. Given the amount of assets the Plan had under management, it should have been able to invest this money in some of the best investments available in the marketplace.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Trustees)

111.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

112.    At all relevant times, the Trustees and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

113.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

114.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to make decisions regarding the Plan's RKA fees.

115.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive Plan RKA costs.

116.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

118.   The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Trustees)**

119.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.   The Trustee Defendants had the authority to appoint and remove any members of the Trustees, and the duty to monitor the Trustees and were aware that the Trustee Defendants had critical responsibilities as fiduciaries of the Plan.

121.   In light of this authority, the Trustee Defendants had a duty to monitor the Trustee Defendants and any unidentified fiduciaries to ensure that the they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Trustee Defendants and/or other unidentified fiduciaries were not fulfilling those duties.

122.   The Monitoring Defendants also had a duty to ensure that the Trustee Defendants and/or other unidentified fiduciaries possessed the needed qualifications and experience to carry

out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

123.    The Trustee Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Trustees Defendants and/or unidentified fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Trustee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated; and

(c)    failing to remove Trustee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and pay exorbitant fees for the Plan's RKA, all to the detriment of the Plan and Plan participants' retirement savings.

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Trustee Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Trustee Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Trustee Defendants and/or other unidentified fiduciaries to the Plan.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendant as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: December 6, 2022                **CAPOZZI ADLER, P.C.**

                                       /s/ *Donald R. Reavey*
                                       Donald R. Reavey, Esquire
                                       PA Attorney ID #82498
                                       2933 North Front Street
                                       Harrisburg, PA 17110
                                       Email: donr@capozziadler.com
                                       Telephone: (717) 233-4101
                                       Fax: (717) 233-4103

                                       /s/ *Mark K. Gyandoh*
                                       Mark K. Gyandoh, Esquire
                                       PA Attorney ID # 324248
                                       **CAPOZZI ADLER, P.C.**
                                       312 Old Lancaster Road
                                       Merion Station, PA 19066
                                       Email: markg@capozziadler.com

Telephone: (610) 890-0200
Fax: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 6, 2022, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: *<u>/s/ Donald R. Reavey</u>*